```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X

LESLIE BLAKE,                            :

                    Plaintiff,           :    05 Civ. 6150 (HBP)

     -against-                           :    OPINION AND
                                              ORDER
FIIT INTERNATIONAL, INC. and JORDI :
PARERA,
                                         :
                    Defendants.
                                         :
---------------------------------X
```

PITMAN, United States Magistrate Judge,

I. Introduction

This is an action for breach of contract arising out of recruitment services that pro se plaintiff Leslie Blake allegedly performed for defendant Fiit International, Inc. ("Fiit") and defendant Jordi Parera. Blake moves for an Order pursuant to Fed.R.Civ.P. 56, granting summary judgment. Parera cross-moves for an Order granting summary judgment dismissing Blake's claim against him personally. The parties have consented to my exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, Blake's motion is denied, and Parera's cross-motion is granted.

II.   Facts

           This action arises from services allegedly performed by Blake, a recruiter and placement agent, for defendants, starting on or about June 1, 2004.  Parera is the Chief Executive Officer, President and majority owner of Fiit, a Delaware corporation with its principal place of business in New York that, at all times relevant to the dispute, sought to sell interactive dual-screen LCD monitors in the United States (Declaration of Jordi Parera, dated September 12, 2006 ("Parera Decl."), ¶¶ 2, 5, 14).

           In the Spring of 2004, Parera's wife saw a newspaper ad for Blake's placement agency and contacted Blake to obtain an aid for Parera's father (Reply of Leslie Blake to Declaration of Jordi Parera, dated October 26, 2006 ("Blake Reply"), ¶¶ 6-7). After finding an aid for Parera's father and subsequently finding an assistant for a trade show presentation, Blake met with Parera to discuss Blake's finding additional personnel for defendants. Blake asserts that she advised Parera at that time of her fees for any future work and he agreed to them; Blake's papers, however, do not disclose any specifics of her discussion with Parera concerning her fees (Blake Reply ¶ 8).

           Subsequently, Blake sent several candidates to Parera to interview for the position of administrative assistant; Parera hired one of these candidates, Gale Grant (Blake Reply ¶ 8).  On July 5, 2004, Blake sent an invoice to Parera for $4,282.50 for

2

her services in connection with locating an administrative assistant (Affidavit of Leslie Blake in Support of Motion for Summary Judgment, dated June 19, 2006 ("Blake Aff."), ¶ 4 & Ex. A).

According to Parera, when Blake sent Fiit the invoice for $4,282.50 "without obtaining Fiit's agreement" (Parera Decl. ¶ 25), Parera immediately contacted Blake and ordered her to stop any work for Fiit until the parties could agree on a compensation scheme (Parera Decl. ¶ 27).  Parera claims that despite the lack of a compensation agreement between Blake and Fiit, Blake continued to perform services for Fiit, and that during this time, he and Blake attempted to negotiate a compensation agreement for services already performed, as well as future services (Parera Decl. ¶ 28).

At some point in the Summer of 2004, Parera proposed that the parties enter into a consultancy agreement.  Under the proposed agreement, Blake and Fiit would agree that, as of June 1, 2004, the value of Fiit was $8,000,000, and that Blake would earn $80,000 in equity "by working diligently for Fiit for 780 hours of one (1) year [fifteen hours per week] from the date of signing the agreement" (Lee Blake's Response to Defendants' Preliminary Statement, dated October 26, 2006 ("Blake Resp. to Prelim. Statement"), Ex. H).  Furthermore, the agreement would

provide that if Blake was terminated less than one year from the date of the agreement,

> the value of [her] then existing equity will be determined by an independent third party, or through arbitration.  For instance, assuming that the current value of Fiit of $8,000,000 increases to $80,000,000 as of the date of termination, then, the difference of $72,000,000 is Fiit's increase in value.  The product of $72,000,000 and 1% or $720,000 will be payable to consultant.

(Blake Resp. to Prelim. Statement, Ex. H).  This agreement was not signed by either party.

After further negotiation, Blake e-mailed Parera on October 9, 2004 and set forth what she believed to be the agreement among Fiit, Parera and Blake: (1) Fiit would pay Blake 20% of sales commissions up to $20,000 or the open invoice of $4,282, at Blake's option, (2) in exchange for a Fiit stock option valued at $80,000, Blake would work in her office for fifteen hours a week for one year, and (3) Blake would work an additional ten hours per week at the Fiit office at a rate of $75 per hour (Parera Decl., Ex. D).  Blake also stated that despite this "original agreement" she was working at Fiit more than seven hours a day for four to five days a week and, therefore, she needed to receive current income to compensate her for this additional time.  She requested that Parera "give some thought to the solution to this issue" and stated that the parties needed to have a signed agreement (Parera Decl., Ex. D).  Parera responded by stating "Yes let's [] talk about it but remember Fiit still

4

show[s] a big [zero] in the sales rapport scores.  Of course I
will sign our agreement, and you are a very important link in the
Fiit chain" (Parera Decl., Ex. D).

On October 14, Blake emailed Parera and reiterated her
understanding of the terms of the agreement.  Parera replied with
his comments the same day (Parera Decl., Ex. E).  He agreed to
having the choice of receiving 20% of sales commissions up to
$20,000 or the $4,282 open invoice, but stipulated that the
option could not be exercised until the end of the year (Parera
Decl., Ex. E).  He also agreed to the $80,000 stock option in
exchange for Blake working for Fiit for fifteen hours per week
for one year, but insisted that all work would be done in Fiit's
office.  However, Parera did not accept the provision that Blake
would work for ten hours per week at the Fiit office for $75 per
hour (Parera Decl., Ex. E).  Blake had previously stated that she
agreed to delay compensation until the first sales were made, to
which Parera responded that "there is not a cash compensation"
(Parera Decl., Ex. E).

Parera e-mailed Blake again that same day[1] setting
forth their agreement: (1) at the end of the year, she could
choose to either receive payment of the unpaid invoice of $4,282

_____

[1]The timestamp on the two e-mails written on October 14
implies that Parera sent this second e-mail after the other
October 14 e-mail discussed above.  The record does not indicate
that there was any intervening communication from Blake to prompt
the second e-mail.

or, if she agreed to wait until earnings were generated, then
receive 20% of commissions up to $20,000 per year, and (2) a
stock option worth $80,000, which Blake would receive by working
"one year 3 hours per day, or a total of 780 hours in a year
(with a nice hourly rate of $102 per hour), with complete flexi-
bility, in how many hours per day, per week, per month . . . ."
(Blake Aff., Ex. D).  Blake claims that defendants never de-
creased her hours to three hours a day (Blake Aff., Ex. C).

　　　　On October 22, Blake sent Parera a letter that set
forth her understanding of the terms of their agreement:  (1) at
the end of the year, she could choose between receiving 20% of
the total paid commission to the Fiit sales force up to $20,000
or payment of the $4,282 invoice, (2) $80,000 in stock option
which would be earned by working one year for three hours a day
or a total of 780 hours in a year with complete flexibility
concerning how many hours per day she decided to work, and (3) an
exit clause that provided that she would receive a proportional
amount of the $80,000 stock option (Parera Aff., Ex. F).  Blake
also informed him that she had calculated that she had worked 575
hours to date for Fiit and that she was "eager to contact [his]
attorney in order to finalize a signed, written agreement" so
that she could continue to move toward her commitment of working
780 hours (Parera Aff., Ex. F).  A week later, Blake set up a
meeting with defendants' attorney, Tsutomu Yasuda, Esq., to

6

finalize the contract (Parera Aff., Ex. G) but Blake then cancelled the appointment (Parera Decl. ¶ 35).

Parera did not hear from Blake again until he received a November 10, 2004 letter in which she claimed she was owed $161,783.50 (Parera Decl. ¶ 36).  Blake calculated the fees owed to her as follows:

| | |
|---|---|
| Category A:  seven salespersons hired @ $1,000 per salespersons hired | =  $7,000.00 |
| Category B:  four managers hired @ a fee of 30% of the annual salary of each manager hired | = $105,000.00[2] |
| Category C:  interviewing twenty-two candidates who were not hired for 65 hours @ $40 per hour | =  $2,600.00 |
| Additional Recruiting:  178 hours of "additional recruiting" @ $40 per hour | =  $7,120.00 |
| Hours Spent Working for Fiit and Jordi Parera at Fiit Office: 347 hours @ $103 per hour | = $35,781.00 |
| Outstanding Invoice: | =  $4,282.50 |
| **Blake's Claim of Total Monies Owed** | **= $161,783.50** |

On December 3, 2004, Parera responded to Blake's November 10 letter.  With respect to the claims Blake asserted under Categories A, B and C, and the fees sought for "additional recruiting," Parera asserted that Blake and Fiit "did not make

---

[2]Blake claims that three of these managers had an annual salary of $100,000 and one manager had an annual salary of $50,000.

any formal or informal agreement regarding the compensation formula provided in [the] letter" (Parera Decl., Ex. I).  Parera also stated that Blake remained free to choose between either the outstanding invoice valued at $4,282.50 or 20% of the commissions paid to Fiit's salespersons, with a ceiling set at $20,000 (Parera Decl., Ex. I).  In addition, Parera stated that because he and Blake were still in the process of negotiating the terms of the $80,000 stock option before she sent him her November 10 letter, her demand of $35,781 was "arbitrary" in both the hours she claimed she worked and the rate of her compensation (Parera Decl., Ex. I).  The parties do not allege any further relevant communications.  Blake commenced this action on July 1, 2005.

Blake now moves summary judgment for the monies due under the alleged contract among her and defendants in the amount of $161,783.50.  According to Blake, defendants owe Blake for her work between June 1, 2004 until November 10, 2004, during which time she performed four different categories of agreed-upon services for Fiit and Parera:  (1) recruiting and hiring sales persons in exchange for $1,000 commission per person hired, (2) recruiting, interviewing and training management personnel in exchange for thirty percent of their first year salary, (3) recruiting all other employees at a rate of $40 per hour, and (4) performing office work for defendants at a rate of $103 per hour (Amended Complaint (Docket Item 12), ¶ 5).

Parera cross-moves for summary judgment dismissing the claim against him personally on the grounds that Blake has not alleged any facts that demonstrate that Parera was transacting business on his own behalf (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant Parera's Cross-Motion for Summary Judgment, dated September 15, 2006 ("Def. Mem."), at 10-11). Parera claims that in all his dealings with Blake, he was acting in his capacity as Fiit's Chief Executive Officer and President and never transacted business with her in his individual capacity (Parera Decl. ¶ 39).

In addition to the cross-motion, defendants claim that there are issues of material fact concerning Blake's citizenship and the existence of complete diversity (Def. Mem. at 7). Defendants do not, however, move to dismiss for lack of subject matter jurisdiction.

III. <u>Analysis</u>

A. <u>Subject Matter Jurisdiction</u>

Blake filed her initial complaint with this Court on July 1, 2005. By an Order dated August 22, 2005, the Honorable William H. Pauley III, United States District Judge, directed Blake to file an amended complaint, finding that she had not adequately alleged subject matter jurisdiction for two reasons

9

(Docket Item 7).  First, the original complaint did not disclose whether Blake and Parera were diverse parties because Blake had alleged the residency of each, but not their citizenship or domicile (see Complaint ¶¶ 1-2).  Second, Blake alleged that Fiit was incorporated in Delaware and had several offices in New York (Complaint ¶ 3), but failed to allege the location of its principal place of business.

In Blake's amended complaint, she alleges that she is a domiciliary of New Jersey, Parera is a resident of Connecticut and Fiit is incorporated in Delaware and maintains its principal place of business in New York (Amended Complaint ¶¶ 1-3).

Defendants question Blake's asserted domicile because she stated in her original complaint that she was a New York resident and because she has used a New York City address for the majority of correspondence with the Court and defendants (Def. Mem. at 8).  As noted above, however, defendants do not move to dismiss for lack of subject matter jurisdiction.

In response, Blake states that when she filed the original complaint, she used her New York office address (Lee Blake's Response to the Affidavit of Irene R. Dubowy, dated October 26, 2006 ("Blake's Resp. to Dubowy Aff."), ¶ 1).  She goes on to state that, when she filed her amended complaint, she used the address of her primary residence in New Jersey, which is a house that she has lived in with her husband for twenty-three

10

years (Blake's Resp. to Dubowy Aff. ¶ 2).  Blake also states that
at a pre-trial conference with Judge Pauley, she informed him
that New Jersey is the state in which she files her taxes, has a
driver's license, and maintains her primary residence (Blake's
Resp. to Dubowy Aff. ¶ 2).  Furthermore, she explains that the
mailbox at her New Jersey residence was vandalized, and she
therefore requested that all mailings be sent to her office in
New York to insure she would receive all correspondence from the
Court (Blake's Resp. to Dubowy Aff. ¶ 3).  She also states that
she is registered to vote in New Jersey.

        Although a federal court has a duty to examine its own
subject matter jurisdiction <u>sua</u> <u>sponte</u>, <u>Grupo Dataflex v. Altal</u>
<u>Global Group, L.P.</u>, 541 U.S. 567, 593 (2004); <u>Lykes Lines Ltd. v.</u>
<u>Bringer Corp.</u>, 04 Civ. 4460 (RMB)(FM), 2007 WL 766170 at *5
(S.D.N.Y. Mar. 12, 2007), and a defect in subject matter juris-
diction is not waivable, <u>Oscar Gruss & Son, Inc. v. Hollander</u>,
337 F.3d 186, 193 (2d Cir. 2003), it is also fundamental that a
federal court relies on the parties before it to develop the
necessary facts concerning all relevant issues.  I cannot issue
subpoenas <u>sua</u> <u>sponte</u>, I cannot serve interrogatories or document
requests and I cannot conduct depositions of either party or
third parties.  In sum, I cannot investigate and gather evidence.
Thus, if defendants believe that the Court lacks subject matter

jurisdiction, they should make a motion supported by evidence and legal authority.

Plaintiff's evidentiary submissions satisfy her burden of making prima facie showing of jurisdiction. Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994); see also United States v. Sforza, 326 F.3d 107, 110 (2d Cir. 2003) ("[O]nly if it appears that the plaintiff can prove no set of facts that would support jurisdiction," may a court dismiss for lack of subject matter jurisdiction.). Accordingly, there is no basis for dismissal of the action at this time.

B.  Summary Judgment Standards

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  This form of relief is appropriate when, after discovery, the party -- here plaintiff -- against whom summary judgment is sought, has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  This form of remedy is inappropri-ate when the issue to be resolved is both genuine and related to a disputed material fact.  An alleged fac-tual dispute regarding immaterial or minor facts be-tween the parties will not defeat an otherwise properly supported motion for summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990). Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant.  Anderson

> v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct.
> 2505, 91 L.Ed.2d 202 (1986).
>
> If the movant demonstrates an absence of a genuine
> issue of material fact, a limited burden of production
> shifts to the nonmovant, who must "demonstrate more
> than some metaphysical doubt as to the material facts,"
> and come forward with "specific facts showing that
> there is a genuine issue for trial." Aslanidis v.
> United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.
> 1993).  If the non-movant fails to meet this burden,
> summary judgment will be granted against it.

Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir.

2004); accord Jeffreys v. City of New York, 426 F.3d 549, 553-54

(2d Cir. 2005); Gallo v. Prudential Residential Servs., Ltd., 22

F.3d 1219, 1223-24 (2d Cir. 1994); see also McPherson v. New York

City Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("spec-

ulation alone is insufficient to defeat a motion for summary

judgment").  In the summary judgment context, "[w]here the

non-moving party is proceeding pro se, the court must interpret

that party's supporting papers liberally, that is, interpret them

'to raise the strongest arguments that they suggest.'"  Forsyth

v. Fed'n Employment & Guidance Serv., 409 F.3d 565, 569 (2d Cir.

2005), quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.

1994); see also Haines v. Kerner, 404 U.S. 519, 520 (1972);

Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  Factual

inferences on a motion for summary judgment must be drawn in

favor of the non-moving party.  Giannullo v. City of New York,

322 F.3d 139, 140 (2d Cir. 2003); Morris v. Lindau, 196 F.3d 102,

111 (2d Cir. 1999).

1.  Blake's Motion for
    Summary Judgment
_____

New York[3] law provides that "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994). See Bierer v. Glaze, Inc., CV-05-2459 (CPS), 2006 WL 2882569 at *4 (E.D.N.Y. Oct. 6, 2006). The principal dispute here is whether there was a contract between the parties, and if so, what its terms were.

Blake argues that Parera informed her several times, both verbally and in writing, that he agreed to the terms to the rates of compensation that she used to calculate her fees for the services she rendered for defendants. Although there is no fully executed contract between Blake and defendants, it does not, of course, follow that there is no contract.

> Under New York law, 'parties are free to enter into a binding contract without memorializing their agreement in a fully executed document.' Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1986). Parties who intend to be bound by informal agreement are so bound even if they contemplate later

_____

[3]"Here, the parties' briefs assume that New York law controls this issue, and such '"implied consent . . . is sufficient to establish choice of law."' Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir.1989))." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004).

memorializing their agreement in writing.  <u>Id.</u> at 80;
<u>R.G. Group, Inc. v. Horn & Hardart Co.</u>, 751 F.2d 69, 74
(2d Cir. 1984).  However, if either party does not
intend to be bound by an agreement until it is in
writing and signed, "no amount of negotiation or oral
agreement to specific terms will result in the forma-
tion of a binding contract."  <u>Winston</u>, 777 F.2d at 80
(<u>citing</u> <u>R.G. Group</u>, 751 F.2d at 74).  In determining
the parties' intent, a court must look, not to their
"after-the-fact professed subjective intent, but their
objective intent as manifested by their expressed words
and deeds at the time."  <u>Stetson v. Duncan</u>, 707 F.
Supp. 657, 666 (S.D.N.Y. 1988) (<u>quoting</u> <u>Reprosystem,</u>
<u>B.V. v. SCM Corp.</u>, 522 F. Supp. 1257, 1275 (S.D.N.Y.
1981), <u>aff'd</u> <u>in</u> <u>part</u>, <u>rev'd</u> <u>in</u> <u>part</u> <u>on</u> <u>other</u> <u>grounds</u>,
727 F.2d 257 (2d Cir. 1984)).

<u>Grupo Sistemas Integrales De Telecomunicacion S.A. De C.V. v.</u>

<u>AT&T Communications, Inc.</u>, 92 Civ. 7862 (KMW), 1994 WL 463014 at

at *3 (S.D.N.Y. Aug. 24, 1994) (footnotes omitted).  In addition,

other documents, such as e-mails between the parties, can give

rise to a binding contract.  <u>Hostcentric Technologies v. Republic</u>

<u>Thunderbolt, LLC</u>, 04 Civ. 1621 (KMW)(AJP), 2005 WL 1377853 at *5

(S.D.N.Y. June 9, 2005).

However, even if there is evidence that the parties

intended to be bound without before executing a formal agreement,

"summary judgment may be granted only when the language of the

contract is unambiguous . . . ."  <u>Chock Full O'Nuts Corp. v.</u>

<u>Tetley, Inc.</u>, 152 F.3d 202, 204 (2d Cir. 1998); <u>Sayers v. Roches-</u>

<u>ter Tel. Corp. Supplemental Mgmt. Pension Plan</u>, 7 F.3d 1091, 1094

(2d Cir. 1993) (same); <u>Giles v. City of New York</u>, 41 F. Supp.2d

308, 315-16 (S.D.N.Y. 1999) (same).

15

Here, Blake has failed to sustain her burden of demon-
strating that no genuine issue of fact exists as to the existence
and terms of her contracts with defendants and the sufficiency of
her performance.  Thus, summary judgment is inappropriate.

First, an overarching problem that the parties do not
even address is whether there was one alleged contract or multi-
ple contracts.  It appears that Blake performed a number of
different services for Fiit, and it is unclear from the record
whether plaintiff is claiming there were discrete agreements to
compensate plaintiff separately for each service that she per-
formed, or whether the parties were allegedly operating under a
single, global agreement that would compensate plaintiff for all
services she performed.  This issue is material because the
evidence of agreement with respect to some of the terms of
compensation is more persuasive than the evidence with respect to
other terms of compensation.  For example, the documentary
evidence appears to be fairly compelling that defendants agreed
to pay plaintiff either $4,282.50 or 20% of commissions, up to a
maximum of $20,000, for some bundle of services.  If this "agree-
ment" constitutes a separate contract or is severable, indefi-
niteness or lack of agreement with respect to either the other
services plaintiff performed and the compensation she was to
receive is immaterial.  On the other hand, if the parties were
operating under a single, global agreement, indefiniteness or

16

lack of agreement concerning other aspects of the alleged agree-
ment may defeat any claim for a contractual remedy.  See gener-
ally Interocean Shipping Co. v. National Shipping & Trading
Corp., 462 F.2d 673, 676 (2d Cir. 1972) ("Under the general
principals of contract law, there is no contract if the parties
fail to agree on all the essential terms or if some of the terms
are too indefinite to be enforceable."); John Street Leasehold
LLC v. F.D.I.C., 95 Civ. 10174 (JGK), 1998 WL 411328 at *3
(S.D.N.Y. July 22, 1998), aff'd, 196 F.3d 379 (2d Cir. 1999)
("Even if the parties believe that they are bound, if the terms
of the agreement are so vague and indefinite that there is no
basis or standard for deciding whether the agreement had been
kept or broken, or to fashion a remedy, and no means by which
such terms may be made certain, then there is no enforceable
contract." (inner quotations and citations omitted)); Wechsler v.
Hunt Health Sys., Inc., 186 F. Supp.2d 402, 411 (S.D.N.Y. 2002)
(same); Mellen & Jayne, Inc. v. AIM Promotions, Inc., 33 App.
Div. 3d 676, 677-78, 823 N.Y.S.2d 99, 100 (2d Dep't 2006) ("The
doctrine of definiteness means that a court cannot enforce a
contract unless it can determine what the parties agreed to
do.").  Thus, the fundamental question of fact as to whether the
parties had one alleged agreement or multiple alleged agreements
precludes granting plaintiff's motion for summary judgment.

There is also a genuine issue of fact as to plaintiff's entitlement to the $4,282.50 claimed in her invoice for services that she performed through July 5, 2004.  Although defendants admit that they agreed to pay plaintiff either $4,282.50 or 20% of the commissions paid to Fiit salesmen, up to a maximum of $20,000 (Parera Decl., Ex. I), there is a question of fact as to what services this payment would constitute compensation for. Plaintiff's November 10, 2004 bill strongly suggests that she understood the $4,282.50 to constitute compensation for services she performed prior to July 5, 2004; she lists it as a separate charge in addition to her charges for the other services she performed after July 5.  Defendants, on the other hand, discuss this sum as the compensation they agreed to pay for the services discussed in categories A, B and C of plaintiff's November 10, 2004 bill and the "Additional" charges listed therein, suggesting that defendants believed that the $4,282.50 -- and the alternative of 20% of commissions -- represented payment for more than the services rendered prior to plaintiff's July 5, 2004 bill. This inference is corroborated by the fact that it would be irrational for defendants to pay _more_ than the amount sought by plaintiff for the services provided by plaintiff prior to July 5, 2004.  Thus, summary judgment is also inappropriate because there are questions of fact concerning the parties' understandings of what services the $4,282.50 was intended to pay for.

18

There is also a genuine issue of fact as to how much of the $80,000 stock option plaintiff is entitled to.  Although there appears to be no dispute concerning plaintiff's entitlement to a pro-rated share of the stock option, there is a dispute as to the number of hours plaintiff worked for defendants and what portion of the option she earned (see Parera Decl., Ex. I). Thus, summary judgment on this aspect of plaintiff's claim is also inappropriate.

In addition, even if there were no issue concerning the portion of the option plaintiff earned, there remain issues of fact as to how to value the option.  Presumably, the grant of $80,00 in stock options contemplated a grant of options that would have enabled plaintiff to purchase Fiit stock for $80,000 less than the fair market value of the stock.  It does not appear to have been a grant of $80,000 in cash (Blake Decl., Ex. D ("there is not a cash compensation")).  Unfortunately, however, the record lacks any evidence confirming that this is what the parties actually understood the grant of options to mean.  The record also fails to contain any evidence that Fiit stock had any fair market value at any relevant time.  If the stock did not have value or was unsaleable for some other reason, an option to purchase the stock would necessarily have limited value.  These additional issues of fact also preclude the granting of plain-tiff's motion for summary judgment.

19

Blake's motion for summary judgment regarding her demands for monies owed under Categories A ($7,000), B ($105,000) and C ($7,120), as well for Additional Recruiting ($2,600), must also be denied because Blake has not met her burden of establishing that no genuine issue of fact exists as to the defendants' duty to pay her these amounts.  Blake offers an e-mail that she sent to Parera on June 21, 2004, which was written after a meeting between Blake and Parera discussing the possibility of the consultancy contract (Blake Reply, Ex. E).  Blake stated in this e-mail that she understood Parera to be proposing that Blake would hire and coach Fiit's staff for an hourly wage.  She also advised him that her minimum fee for employees hired was $1,000 per employee, that the industry standard for recruiting "professional level employees is in the neighborhood of 25% of annual salary," and that she charged $40 per hour for screening applicants who were not hired (Blake Reply, Ex. E).  However, Blake does not offer any evidence that Parera assented to her understanding of Parera's proposal and the additional terms she was suggesting.  Parera asserts that he never agreed to a fee of $1,000 per sales person hired (Parera Decl., ¶ 32).  This conflicting evidence gives rise to another question of fact.

Blake's submission of the affidavit of a former Fiit sales-manager, Conor Cleland, does not provide her with any substantial help.  Although Cleland corroborates that plaintiff

performed service for Fiit, he is not able to shed any light on what agreement, if any, plaintiff had with Fiit, nor is he able to quantify the hours worked by plaintiff or the compensation to which she is entitled (see Affidavit of Conor Cleland in Support of Motion for Summary Judgment, dated June 29, 2006 ("Cleland Aff."), ¶ 4).

Given all the issues of fact identified above, plaintiff's motion for summary judgment must be denied.

In Blake's reply, she asserts a claim for quantum meruit, stating that she believes she has "a claim for services rendered, either on the basis of a valid or contract . . . or on the basis of 'quantum meruit' . . . ." (Blake Reply ¶ 18).

Under New York law, a plaintiff can recover in quantum meruit if he demonstrates "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Hose Corp., 418 F.3d 168, 175 (2d Cir. 2005), quoting Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 69 (2d Cir. 2000).  A plaintiff may plead the alternative theories of breach of contract and quantum meruit, Marcella v. ARP Films, Inc., 778 F.2d 112, 117 (2d Cir. 1985), but may not recover in quantum meruit "if the parties have a valid, enforceable contract that governs the same subject

matter as the quantum meruit claim." Mid-Hudson Catskill Rural
Migrant Ministry, Inc. v. Fine Hose Corp., supra, 418 F.3d at 175
(citations omitted).  However, a plaintiff may still recover in
quantum meruit, notwithstanding a valid contract, where the scope
of the contract does not cover the work in issue.  Mid-Hudson
Catskill Rural Migrant Ministry, Inc. v. Fine Hose Corp., supra,
418 F.3d at 175.

    Although Blake does not expressly assert a quantum
meruit claim in her amended complaint, in light of plaintiff's
pro se status, I shall construe her amended complaint and other
submissions liberally.  Haines v. Kerner, 404 U.S. 519, 520
(1972) (per curiam); Ciak v. United States, 59 F.3d 296, 306 n.9
(2d Cir. 1995), abrogated on other grounds by Mickens v. Taylor,
535 U.S. 162 (2002); Platsky v. Cent. Intelligence Agency, 953
F.2d 26, 28 (2d Cir. 1991).  Therefore, I shall deem her com-
plaint to assert an alternative claim for quantum meruit.
Nevertheless, summary judgment is still inappropriate.  Plaintiff
first raised the quantum meruit claim in her reply papers, and it
is inappropriate to grant summary judgment on new theories first
raised in reply since the non-moving party does not have an
opportunity to reply to such theories.  Scherer v. Equitable Life
Assurance Soc'y, 01 Civ. 10193 (CSH), 2004 WL 2101932 at *5 n.1
(S.D.N.Y. Sept. 21, 2004); Hughes v. J.P. Morgan Chase & Co., 01
Civ. 6878 (BSJ), 2004 WL 1403337 at *3 n.3 (S.D.N.Y. June 22,

2004).  Second, plaintiff does not offer evidence sufficient to show the absence of a genuine issue of fact concerning the nature of the services she actually performed for defendants, the number of hours worked and the reasonable value of those services. Thus, although it appears that plaintiff would have a viable claim for quantum meruit if her contract claim failed, numerous questions of fact preclude it from being resolved by summary motion.

In light of plaintiff's <u>pro</u> <u>se</u> status, I note in closing that I am not ruling that plaintiff has no case nor am I concluding that defendants will probably prevail on the merits. All that I am concluding is that the evidence available at this stage of the proceedings is not so one-sided that a verdict for plaintiff is inevitable and that resolution of the case by summary disposition is not appropriate.

2. Parera's Cross-Motion
   for Summary Judgment

Parera states in his declaration that he transacted business with Blake only in his capacity as an officer of Fiit (Parera Decl. ¶ 39) and argues that he is entitled to summary judgment because he was the agent for a disclosed principal and there is no evidence that he clearly intended to be personally bound.

23

Under New York law, an agent for a disclosed principal is not liable for a breach of contract "unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." Lerner v. Amalgamated Clothing & Textile Workers Union, 938 F.2d 2, 5 (2d Cir. 1991), quoting Mencher v. Weiss, 306 N.Y. 1, 4, 114 N.E.2d 177, 179 (1953).  See also Dow Chem. Pacific Ltd. v. Rascator Mar. S.A., 782 F.2d 329, 339 (2d Cir. 1986). Consequently, New York courts will hold a corporate officer individually liable only in rare circumstances.  Lerner v. Amalgamated Clothing & Textile Workers Union, supra, 938 F.2d at 5; Turtle & Hughes, Inc. v. Browne, 95 Civ. 9573 (SHS), 1996 WL 384895 at *2 (S.D.N.Y. July 8, 1996) (same).  The factors to be considered in determining whether an officer should be bound include:

> the length of the contract, the location of the liability provision(s) in relation to the signature line, the presence of the signatory's name in the agreement itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation.

Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo, 35 F.3d 29, 35 (2d Cir. 1994).  See Turtle & Hughes, Inc. v. Browne, supra, 1996 WL 384895 at *2; Paribas Props., Inc. v. Benson, 146 A.D.2d 522, 526, 536 N.Y.S.2d 1007, 1009-10 (1st Dep't 1989).

Here, the first four factors weigh against Blake because there is no document that can be definitively said to be

24

the contract between the parties.  Even if there were a contract formed in the e-mails between the parties, "the crucial inquiry is not whether [Parera's] name appears in the contract, but whether it appears in the provision purporting to bind [him] personally."  Turtle & Hughes, Inc. v. Browne, supra, 1996 WL 384895 at *3.  Blake has not offered any written communication between Parera and her that contains such a provision.  Although the fifth factor weighs in favor of Blake because Parera is the majority shareholder, President and Chief Executive Officer of Fiit, see Integrated Mktg. & Promotional Solutions, Inc. v. JEC Nutrition, LLC, 06 Civ. 5640 (JFK), 2006 WL 3627753 at *6 (Dec. 12, 2006), Parera's position at Fiit, without more, is insufficient to bind him personally to an alleged contract between Fiit and Blake.

Blake has not submitted any material that clearly and explicitly establishes that Parera intended to be personally bound.  Blake has submitted an e-mail written by Parera to Blake on October 14, 2004, in which he states "[t]he agreement between us is as follows . . . ." (Blake Aff., Ex. D) (emphasis added), but the usage of "us" is too vague to establish that Parera was referring to himself in an individual capacity.  See Vanlab Corp. v. Blossom Balley Foods Corp. 04-CV-6183 (MAT), 2005 WL 2406001 at *5 (W.D.N.Y. Sept. 29, 2005) (in a guarantee letter that stated "We hereby guarantee," the use of the pronoun "we" showed

that the agent signed jointly with the corporation and did not intend to be personally liable).  Cleland's affidavit, which states that Blake "performed services for both Mr. Parera personally and for Fiit International, Inc." (Cleland Aff. ¶ 3), is similarly too vague to establish Parera's intent to be personally bound.

Although Blake states in her reply papers that she did a variety of personal work for Parera, including helping Parera with English, applying for credit cards on his behalf, and providing personal references to potential landlords and prospective investors (Blake Resp. to Prelim. Statement, Ex. B), Blake does not offer any evidence that demonstrates that Parera agreed to pay her separately for these services, or that he would be personally liable on her contract with Fiit as a result of these services.  Moreover, Blake did not list these services in her November 10, 2004 demand letter or Amended Complaint.  Thus, her claim for a breach of contract does not appear to stem from services allegedly performed for Parera as an individual.

Therefore, since there is no clear and explicit evidence that Parera intended to be individually liable in his transactions with Blake, Parera's cross-motion for summary judgment is granted and all claims against him in his individual capacity are dismissed.

IV.  <u>Conclusion</u>

26

judgment is granted and all claims against him in his individual capacity are dismissed.

IV.  Conclusion

Accordingly, for all the foregoing reasons, Blake's motion for summary judgment is denied.  Parera's cross-motion for summary judgment is granted and the claim against him is dismissed.

Dated:  New York, New York
        March 30, 2007

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies mailed to:

Ms. Leslie Blake
P.O. Box 1132
Forked River, New Jersey 08731

Irene R. Dubowy, Esq.
Brian C. Dunning, Esq.
Thompson & Knight, LLP
919 Third Avenue
New York, New York 10022-3915